PHILLIP A. TALBERT
United States Attorney
ANGELA L. SCOTT
Assistant United States Attorney

    United States Attorney's Office
    501 I Street, Suite 10-100
    Sacramento, CA. 95814
    Telephone:  (916) 554-2700

KRISTEN CLARKE
Assistant Attorney General, Civil Rights Division
CHRISTOPHER J. PERRAS
Special Litigation Counsel

    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, DC 20530
    Telephone:  (202) 514-3847

MATTHEW G. OLSEN
Assistant Attorney General, National Security Division
JACOB WARREN
Trial Attorney

    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, DC 20530
    Telephone:  (202) 514-2007

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>DALLAS ERIN HUMBER, and<br>MATTHEW ROBERT ALLISON,<br><br>       Defendants. | CASE NO.  2:24-CR-257-DJC |

GOVERNMENT'S MOTION FOR DETENTION

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................2

II.     PROCEDURAL POSTURE ........................................................................................3

III.    LEGAL STANDARDS AND PROCEDURES.............................................................4

     A.      Eligibility for Detention ................................................................................4

     B.      Rebuttable Presumption of Detention .........................................................4

     C.      Section 3142(g) Factors ................................................................................5

     D.      Evidentiary Considerations ..........................................................................6

IV.     ANALYSIS...................................................................................................................6

     A.      A Detention Hearing is Mandatory Under § 3142(f)................................6

     B.      There is a Rebuttable Presumption of Detention in this Case .................7

     C.      18 U.S.C. § 3142(g) Analysis ........................................................................8

          1.      Nature and Circumstances of the Offenses ......................................8

          2.      Weight of the Evidence.......................................................................10

          3.      History and Characteristics ..............................................................12

          4.      Risk of Flight .......................................................................................13

          5.      Risk of Destruction of Evidence ........................................................15

          6.      Danger Posed by Release....................................................................16

               a.      Danger to Communities all over the World.............................16

               b.      Danger to Suspected Informants, Witnesses, and Undercover Agents ...............................................................................................19

               c.      Danger to Law Enforcement.....................................................20

V.      CONCLUSION...........................................................................................................22

# TABLE OF AUTHORITIES

Page

## CASES

*United States v. Al-Arian*,
   280 F.Supp.2d 1345 (M.D. Fla. 2003) ................................................................. 7

*United States v. Baker*,
   2023 WL 8254717 (D. Idaho Nov. 29, 2023) .................................................... 17

*United States v. Boy*,
   322 F. App'x 598 (10th Cir. 2009) ................................................................... 16

*United States v. Cole*,
   465 F. Supp. 3d 1175 (W.D. Wash. 2020) .................................................. 10, 21

*United States v. Cook*,
   880 F.2d 1158 (10th Cir. 1989) ....................................................................... 16

*United States v. Dai*,
   2023 WL 11016392 (N.D.N.Y. Dec. 19, 2023), *aff'd*, 99 F.4th 136 (2d Cir. 2024) ........................... 10

*United States v. DeGrave*,
   539 F. Supp. 3d 184 (D.D.C. 2021) ................................................................. 16

*United States v. Eccleston*,
   140 F. Supp. 3d 102 (D.D.C. 2015) ............................................................ 18, 19

*United States v. Ferdaus*,
   2011 WL 5909547 (D. Mass. Nov. 28, 2011) ..................................................... 8

*United States v. Figueroa-Alvarez*,
   681 F.Supp.3d 1131 (D. Idaho 2023) .............................................................. 14

*United States v. Garcia*,
   801 F. Supp. 258 (S.D. Iowa 1992) ................................................................... 5

*United States v. Gebro*,
   948 F.2d 1118 (9th Cir. 1991) ..................................................................... 5, 13

*United States v. Haider*,
   2023 WL 8544277 (E.D. Cal. Dec. 11, 2023) .................................................. 17

*United States v. Hassan*,
   2021 WL 826253 (E.D.N.Y. Mar. 4, 2021) ........................................................ 8

*United States v. Heffington*,
  2009 WL 112375 (E.D. Cal. Jan. 15, 2009) ........................................................ 20

*United States v. Hir*,
  517 F.3d 1081 (9th Cir. 2008) ................................................................... passim

*United States v. Jessup*,
  757 F.2d 378 (1st Cir. 1985)............................................................................. 5

*United States v. Kane*,
  2020 WL 1660058 (W.D. Wash. Apr. 3, 2020) ................................................ 6

*United States v. Keeton*,
  457 F. Supp. 3d 855 (E.D. Cal. 2020)............................................................. 10

United States v. Kurashev,
  2023 WL 8358108 (E.D. Cal. Dec. 1, 2023) .............................................. 8, 18

*United States v. Langenhorst*,
  130 Fed. App'x. 892 (9th Cir. 2005) ............................................................. 20

*United States v. Lee*,
  2024 WL 233188 (D. Ariz. Jan. 22, 2024) ..................................................... 6

*United States v. Marigny*,
  2020 WL 4260622 (N.D. Cal. July 24, 2020)................................................ 18

*United States v. Mehanna*,
  669 F. Supp. 2d 160 (D. Mass. 2009) ....................................................... 8, 10

*United States v. Mercedes*,
  254 F.3d 433 (2d Cir. 2001)............................................................................. 5

*United States v. Mjoness*,
  2021 WL 4078002 (10th Cir. July 13, 2021) .................................................. 6

*United States v. Musse*,
  107 F. Supp. 3d 1012 (D. Minn. 2015) .......................................................... 17

*United States v. Patriarca*,
  948 F.2d 789 (1st Cir. 1991)........................................................................... 12

*United States v. Petersen*,
  557 F. Supp. 2d 1124 (E.D. Cal. 2008)......................................................... 17

*United States v. Powell*,
  2022 WL 769479 (D. Idaho Mar. 14, 2022) .................................................. 15

*United States v. Rhodes*,
    648 F. Supp. 3d 801 (E.D. Tex. 2022) ........................................................... 16

*United States v. Saab*,
    2021 WL 5868157 (S.D.N.Y. Dec. 10, 2021) ................................................ 11

*United States v. Salerno*,
    481 U.S. 739 (1987) ..................................................................................... 8, 9

*United States v. Salkicevic*,
    2015 WL 525556 (N.D. Ill. Feb. 10, 2015) ...................................................... 8

*United States v. Santos-Flores*,
    794 F.3d 1088 (9th Cir. 2015) ....................................................................... 14

*United States v. Sheikh*,
    994 F.Supp.2d 736 (E.D.N.C. 2014) ............................................................ 7, 8

*United States v. Stone*,
    608 F.3d 939 (6th Cir. 2010) ........................................................................ 7, 8

*United States v. Terrones*,
    712 F. Supp. 786 (S.D. Cal. 1989) .................................................................. 6

*United States v. Tortora*,
    922 F.2d 880 (1st Cir. 1990) ............................................................... 11, 16, 20

*United States v. Townsend*,
    897 F.2d 989 (9th Cir. 1990) ......................................................................... 13

*United States v. Vasquez-Benitez*,
    919 F.3d 546 (D.C. Cir. 2019) ........................................................................ 5

*United States v. Winsor*,
    785 F.2d 755 (9th Cir. 1986) ........................................................................... 6

**STATUTES**

18 U.S.C. § 119 .................................................................................................. 3

18 U.S.C. § 371 .................................................................................................. 3

18 U.S.C. § 373 .................................................................................................. 3

18 U.S.C. § 842(p) ............................................................................................. 3

18 U.S.C. § 875(c) ...................................................................................... 3, 6, 9

18 U.S.C. § 1114 ........................................................................................................... 3

18 U.S.C. § 2332(b)(5)(B) .............................................................................................. 9

18 U.S.C. § 2332b(g)(5)(B) ............................................................................................ 9

18 U.S.C. § 2339A ................................................................................................ passim

18 U.S.C. § 3141 ........................................................................................................... 4

18 U.S.C. § 3142(e)(1) ................................................................................................... 5

18 U.S.C. § 3142(e)(3) ................................................................................................... 4

18 U.S.C. § 3142(e)(3)(C) .............................................................................................. 2

18 U.S.C. § 3142(f) ....................................................................................................... 5

18 U.S.C. § 3142(f)(1)(A)–(E) ....................................................................................... 4

18 U.S.C. § 3142(f)(2) ................................................................................................... 4

18 U.S.C. § 3142(f)(2)(A)–(B) ...................................................................................... 4

18 U.S.C. § 3142(g) .................................................................................................... 5, 8

18 U.S.C. § 3142(g)(1) ................................................................................................... 7

18 U.S.C. § 3142(g)(3)(A) ............................................................................................ 12

18 U.S.C. § 3156 ........................................................................................................... 6

**OTHER AUTHORITIES**

Adam Goldman and Ali Winston, *F.B.I. Arrests White Nationalist Leader Who Fled the Country for Central America*, NEW YORK TIMES, Oct. 24, 2018 ....................................................... 14

Ali Winston, *White supremacist Robert Rundo extradited from Romania to US to face charges*, THE GUARDIAN, Aug. 2, 2023 ........................................................................................ 14

Daniel De Simone, Andrei Soshnikov & Ali Winston, *Neo-Nazi Rinaldo Nazzaro running US militant group The Base from Russia*, BBC, Jan. 24, 2020 .................................................... 14

PHILLIP A. TALBERT
United States Attorney
ANGELA L. SCOTT
Assistant United States Attorney

     United States Attorney's Office
     501 I Street, Suite 10-100
     Sacramento, CA. 95814
     Telephone: (916) 554-2700

KRISTEN CLARKE
Assistant Attorney General, Civil Rights Division
CHRISTOPHER J. PERRAS
Special Litigation Counsel

     U.S. Department of Justice
     950 Pennsylvania Avenue NW
     Washington, DC 20530
     Telephone: (202) 514-3847

MATTHEW G. OLSEN
Assistant Attorney General, National Security Division
JACOB WARREN
Trial Attorney

     U.S. Department of Justice
     950 Pennsylvania Avenue NW
     Washington, DC 20530
     Telephone: (202) 514-2007

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. |
| Plaintiff, | GOVERNMENT'S MOTION FOR DETENTION |
| v. | |
| DALLAS ERIN HUMBER, and MATTHEW ROBERT ALLISON, | |
| Defendants. | |

# I.   **INTRODUCTION**

The United States of America, by and through the undersigned attorneys, hereby moves to detain Defendants Dallas Humber and Matthew Allison in the above-captioned case.  Defendants—leaders of the Terrorgram Collective, a transnational terrorist organization[1]—should be detained for several reasons: (1) Defendants are charged with soliciting bias-motivated mass-shootings, political assassinations, and terrorist attacks on critical infrastructure—serious crimes that warrant detention to protect public safety and national security; (2) Defendants are charged with a federal crime of terrorism—conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A (Count 15)—which carries a presumption of detention under § 3142(e)(3)(C); (3) Defendants are a significant flight risk: their sentencing exposure (life in prison) gives them a powerful incentive to flee, and their risk of flight is compounded by the minimal connections the Defendants have to their communities and their ties to a domestic and international network of terrorists upon whom they may rely to flee and conceal their whereabouts; (4) Defendants pose a grave danger to the community: they have incited terrorist attacks domestically and abroad, they know how to make 3D-printed guns and improvised explosive devices, and they have advised other members of the Terrorgram Collective that if federal agents try to arrest them, they should commit an "ambush attack" (Defendant Humber) and "go down fucking shooting" (Defendant Allison); (5) Defendants have directed other members of the Terrorgram Collective to destroy evidence and retaliate against informants; and (6) no combination of conditions would mitigate the foregoing risks and dangers because all the Defendants need is an internet connection to induce terrorist attacks, destroy evidence, retaliate against witnesses; and because both Defendants have vowed to keep doing so until the day that they die,[2] thus creating "an unacceptably high risk that [they] would not comply in good faith with the proposed conditions, or any other combination of release conditions, imposed upon [them]."  *United States v. Hir*, 517 F.3d 1081, 1093 (9th Cir. 2008).  For those reasons, further detailed in this brief, the United States respectfully submits that the Defendants should be detained pending trial.

---

[1] On April 26, 2024, the United Kingdom designated the Terrorgram Collective a terrorist group.

[2] In a recorded jail call with Brandon Russell, the founder of neo-Nazi group Atomwaffen Division and member of the Terrorgram Collective, who is charged with conspiring to destroy energy facilities, Defendant Humber vowed, "There's no quitting our worldview. It's a lifelong commitment." *See* Exhibit A.  Defendant Allison similarly pledged, in a Terrorgram post, "I won't quit til I'm dead. my only goal in life is to fucking destroy the enemy."  *See* Exhibit B.

## II.     PROCEDURAL POSTURE

On September 5, 2024, a federal grand jury in the Eastern District of California returned an indictment charging the defendants with fifteen federal felony offenses:

- Soliciting hate crimes, in violation of 18 U.S.C. § 373 and § 249 (4 counts);

- Soliciting the murder of a federal official, in violation of 18 U.S.C. § 373 and § 1114 (3 counts);

- Doxing a federal official, in violation of 18 U.S.C. § 373 and § 119 (3 counts);

- Interstate threatening communications, in violation of 18 U.S.C. § 875(c) (1 count);

- Distributing bombmaking instructions, in violation of 18 U.S.C. § 842(p) (2 counts);

- Conspiring to commit the foregoing offenses, in violation of 18 U.S.C. § 371 (1 count); and

- Conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A (1 count);

The indictment was placed under seal pending arrests of the Defendants.

The next day, federal authorities arrested Defendant Humber in California and Defendant Allison in Idaho; and seized evidence, pursuant to search warrants, from their persons and properties.  Inside a property where Defendant Humber stored her belongings, federal authorities found domestic terrorist patches, Nazi paraphernalia, 3D printed firearms (including a 3D printed AR-15 assault rifle), 3D printers, ammunition, trigger extenders, sim cards, and flash drives.  Inside Defendant Humber's safe, federal authorities found, among other things, a printed copy of The Hard Reset,[3] more Nazi paraphernalia, an AR-15 assault rifle, a short-barreled rifle, materials for 3D printing firearms, high-capacity magazines and unregistered handguns, and a notebook listing white supremacist attackers (including Dylann Roof) with whom she corresponds.  When Defendant Allison was arrested, he was wearing a backpack containing zip ties, duct tape, a gun, ammunition, a knife, lock-picking equipment, two phones, and a thumb drive.

---

[3] The Hard Reset is a publication by the Terrorgram Collective "explaining and justifying Terrorgram ideology; providing detailed instructions and tactical advice for carrying out bias-motivated violence and committing terrorist attacks on critical infrastructure; providing instructions for making bombs and explosives, including Napalm, thermite, chlorine gas, pipe bombs, and dirty bombs; identifying targets to attack; instructing readers how to effectively run a terror cell; celebrating terrorist attacks and violent extremism; and inciting readers to terrorist action in support of Terrorgram's cause." *See* ECF 1 (Indictment, Paragraph 5 of the General Allegations).

During a search of his apartment, federal authorities found, among other evidence, an assault rifle, ammunition, two laptop computers, an external hard drive, and a "go bag."  The go-bag contained $1500 cash, a passport, an original birth certificate, clothes, deodorant, baggies of pills, a thumb drive, sim cards, a firearm holster, ammunition, an Atomwaffen mask, and a black balaclava.  During questioning by federal authorities, after being advised of his <u>Miranda</u> rights and subsequently waiving those rights, Defendant Allison confessed during a video- and audio-recorded interview to engaging in acts alleged in the General Allegations of the Indictment as a member of the Terrorgram Collective.

Initial appearances in the Eastern District of California (Defendant Humber) and the District of Idaho (Defendant Allison) are expected to be held on September 9, 2024 (Defendant Humber) and September 10, 2024 (Defendant Allison).

### III.        LEGAL STANDARDS AND PROCEDURES

The Bail Reform Act (BRA), 18 U.S.C. § 3141 *et seq.*, sets forth the rules governing pretrial detention in federal court.

#### A.        Eligibility for Detention

Under the BRA, if the United States moves to detain a defendant, a detention hearing "shall" be held if the case involves a charged offense falling in one of five enumerated categories, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten, injure, or intimidate a witness or juror, *id.* § 3142(f)(2)(A)–(B).  The required detention hearing "shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance."  *Id.* § 3142(f)(2).

#### B.        Rebuttable Presumption of Detention

For certain enumerated offenses, there is a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" one of the enumerated offenses.  *Id.* § 3142(e)(3).  As relevant here, the list of offenses that trigger the rebuttable presumption of detention includes "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is

prescribed." *Id.* § 3142(e)(3)(C).   One of the enumerated offenses in § 2332b(g)(5)(B) is "2339A (relating to providing material support to terrorists)."

The presumption of detention shifts the burden of production to the defendant; the burden of persuasion remains with the United States. *Hir*, 517 F.3d at 1086.   "Although most rebuttable presumptions found in the law disappear when any evidence is presented by the opponent of the presumption, the rebuttable presumption of § 3142(e) is not such a 'bursting bubble.'" *United States v. Garcia*, 801 F. Supp. 258, 261 (S.D. Iowa 1992) (citing *United States v. Jessup*, 757 F.2d 378, 383 (1st Cir. 1985)).   To rebut the presumption of detention set forth in § 3142(e)(3), the defendant must come forward with evidence that he or she does not pose a danger to the community or a risk of flight. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).   "Once a defendant has met his burden of production relating to these two factors, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Id.*   The presumption remains as a factor to be weighed in recognition "that Congress has found that certain [offenders], as a general rule, pose special risks of flight [and danger]." *Garcia*, 801 F. Supp. at 261.

### C.      Section 3142(g) Factors

The BRA provides four factors to guide a court's determination as to whether a defendant is a flight risk or a danger to the community: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to the community posed by the defendant's release.  18 U.S.C. § 3142(g).   In cases with a rebuttable presumption of detention, the court considers the four factors "[t]o determine whether the presumptions of dangerousness and flight are rebutted." *Mercedes*, 254 F.3d at 436.

A judge "shall order" the "detention of the [defendant] before trial," if, after a detention hearing held under 18 U.S.C. § 3142(f), and upon consideration of "the available information concerning" the four enumerated factors, *id.* § 3142(g), "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," *id.* § 3142(e)(1).   "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).   "[T]he government bears the burden of showing by a preponderance of the

1  evidence that the defendant poses a flight risk, and by clear and convincing evidence that the defendant

2  poses a danger to the community." *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

3  **D.      Evidentiary Considerations**

4  During a detention hearing, both the defendant and the government may offer evidence or

5  proceed by proffer. *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986); § 3142(f)(2) ("The rules

6  concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration

7  of information at the hearing.").  The defendant "shall be afforded an opportunity to testify, to present

8  witnesses on his own behalf, [and] to cross-examine witnesses who appear at the hearing." *Winsor*, 785

9  F.2d at 756.  However, detention hearings "are not to be transformed into a full-fledged trial or a

10  defendant's discovery expedition." *United States v. Terrones*, 712 F. Supp. 786, 791 (S.D. Cal. 1989).

11  **IV.      ANALYSIS**

12  **A.      A Detention Hearing is Mandatory Under § 3142(f)**

13  A detention hearing is mandatory under the BRA for several independent reasons.

14  First, a detention hearing is mandatory under § 3142(f)(1)(A) because the Defendants are

15  charged with "an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment

16  of 10 years or more is prescribed"—namely, conspiring to provide material support to terrorists, in

17  violation of 18 U.S.C. § 2339A (Count 15).

18  Second, a detention hearing is mandatory under § 3142(f)(1)(A) because the Defendants are

19  charged with committing one "crime of violence"—namely, transmitting threatening communications,

20  in violation of 18 U.S.C. § 875(c) (Count 12).[4]  Additionally, Defendants are charged with seven counts

21  of soliciting a crime of violence (Counts 2, 3, 4, 5, 6, 7, 8); three counts of doxing a federal official with

22  the intent to incite the commission of a crime of violence (Counts 9, 10, and 11); and two counts of

23

24  _____

25  [4] *See United States v. Lee*, No. 23-01694-001, 2024 WL 233188, at *4 (D. Ariz. Jan. 22, 2024) (finding that 875(c) charge is a crime of violence weighing against defendant's release at detention

26  hearing); *United States v. Kane*, No. 3:20-MJ-5054 TLF, 2020 WL 1660058, at *2 (W.D. Wash. Apr. 3, 2020) ("The Complaint charges the defendant, Mr. Kane, with having committed three felony offenses,

27  two of which are for making Interstate Threats, 18 U.S.C. § 875(c), which is a crime of violence as defined under 18 U.S.C. § 3156 (a)(4)(A) of the Bail Reform Act.");*United States v. Mjoness*, No. 20-8029, 2021 WL 4078002, at *10 (10th Cir. July 13, 2021) (holding that a "conviction under § 875(c) for

28  making an interstate threat to injure is a crime of violence").

distributing bombmaking instructions with the intent that they be used for or in furtherance of a crime of violence (Counts 13 and 14).

Third, a detention hearing is mandatory under § 3142(f)(2)(A) because there is a "serious risk" that the Defendants "will flee," for the reasons set forth in Section IV.C.4, *infra*, of this motion.

Fourth, a detention hearing is mandatory under § 3142(f)(2)(B) because there is a "serious risk" that the Defendants "will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror," for the reasons set forth in Section IV.C.6.B, *infra*, of this motion.

For each of those reasons, the United States respectfully submits that a detention hearing is mandatory in this case.

### B.      There is a Rebuttable Presumption of Detention in this Case

Because the grand jury returned an indictment charging Defendants with an enumerated federal crime of terrorism—conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A (Count 15)—there is a rebuttable presumption of detention under § 3142(e)(3)(C). *Hir*, 517 F.3d at 1086 (noting the existence of "probable cause to believe that the defendant has committed an offense identified as a '[f]ederal crime of terrorism'" where grand jury returned an indictment charging the defendant with violating § 2339A); *see also United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("A grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged. Thus, when the government presents an indictment including charges listed in section 3142(e)(3), it has fulfilled its burden to establish the presumption in favor of detention.").

The rebuttable presumption of detention for defendants charged with a federal crime of terrorism is predicated on the reality that "terror rips civilization's fabric." *See United States v. Sheikh*, 994 F.Supp.2d 736 (E.D.N.C. 2014) ("Congress itself recognized the serious nature of terrorism by specifically compelling courts to consider whether the alleged crime is a 'Federal crime of terrorism.' 18 U.S.C. § 3142(g)(1). The allegation of such a crime weighs heavily against the defendant. It is not a common violent crime, but rather terror that rips civilization's fabric.") (citing *United States v. Al–Arian*, 280 F.Supp.2d 1345, 1351 (M.D. Fla. 2003)).  Given the grave danger posed by terrorists and those who

1  support them, courts almost always detain defendants charged with providing material support to

2  terrorists and terrorist groups, even where other factors militate against detention.[5]

3    Defendants Humber and Allison have not only provided material support to terrorists; they have

4  dedicated their lives to running a terrorist organization and soliciting terrorist attacks around the world.

5  For that reason, the Defendants cannot overcome the presumption of detention and, considering the factors

6  set forth in § 3142(g), addressed in the following Section of this brief, there are no conditions of release

7  that will reasonably assure the appearance of the Defendants as required and the safety of the community.

8    **C.    18 U.S.C. § 3142(g) Analysis**

9    Based on an individualized evaluation of the defendants, each of the four factors outlined in §

10  3142(g)—(1) the nature and circumstances of the offenses charged; (2) the weight of the evidence; (3)

11  the Defendants' history and characteristics; and (4) the nature and seriousness of the danger to the

12  community posed by the Defendants' release—militates in favor of detention in this case.

13    *1.    Nature and Circumstances of the Offenses*

14    Section 3142(g) instructs this Court to consider "the nature and circumstances of the offense

15  charged, including whether the offense" falls within one of the enumerated categories of offenses that

16  Congress designated as especially serious: "a crime of violence, a violation of section 1591, a Federal

17  crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or

18  destructive device." § 3142(g).  The above categories, in Congress's judgment, capture "the most

19  serious of crimes." *United States v. Salerno*, 481 U.S. 739, 747 (1987).

---

[5] *See, e.g.*, *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (affirming detention of § 2339A defendant notwithstanding strong community ties and no criminal record); *United States v. Kurashev*, No. 2:21-CR-00040-KJM-1, 2023 WL 8358108, at *4 (E.D. Cal. Dec. 1, 2023) (detaining § 2339B defendant notwithstanding that he had no criminal history, had a positive employment history, and was a father of four young children); *Stone*, 608 F.3d at 950 (finding that "[w]hile only [two of five defendants] have prior criminal histories, courts have never required a prior criminal record before ordering detention" and holding that all five defendants charged with a crime of terrorism should be detained); *United States v. Salkicevic*, No. 15-CR-0060, 2015 WL 525556, at *3-*4 (N.D. Ill. Feb. 10, 2015) (detaining § 2339A defendant who was employed with husband and four minor children); *Sheikh*, 994 F.Supp.2d at 741 (detaining § 2339B defendant with no criminal record); *United States v. Ferdaus*, No. 11-10331, 2011 WL 5909547, at *7–9 (D. Mass. Nov. 28, 2011) (detaining § 2339B defendant with no criminal convictions); *United States v. Hassan*, No. 18-CR-603, 2021 WL 826253, at *3 (E.D.N.Y. Mar. 4, 2021) ("Even if I found the weight of the evidence favored defendant, the seriousness of the charged offenses and the nature of his foreign ties would outweigh that factor."); *United States v. Mehanna*, 669 F. Supp. 2d 160, 165-66 (D. Mass. 2009) (detaining § 2339A defendant despite record of compliance with court-imposed release conditions).

The nature of the charged offenses weighs heavily in favor of detention.  The Defendants are charged with fifteen felony offenses, thirteen of which involve "the most serious of crimes," *Salerno*, 481 U.S. at 747: crimes of violence (Counts 2-14)[6] and a federal crime of terrorism[7] (Count 15).  *Id.*  The Ninth Circuit has described providing material support to terrorists as an "extremely serious" crime that "weigh[s] strongly in favor" of detention.  *Hir*, 517 F.3d at 1090.

The circumstances of the charged offenses—that the Defendants, as leaders of a transnational terrorist group, committed the offenses to promote white supremacist accelerationism and induce terrorist attacks domestically and abroad—further militates in favor of detention.  As set forth in the Indictment, the Defendants conspired to recruit, radicalize, equip, advise, inspire, and solicit others to commit bias-motivated mass-murder, political assassinations, and terrorist attacks on critical infrastructure.  In furtherance of that conspiracy, the Defendants created and disseminated a hit list of "high value targets" for assassination—including in the list personal identifying information of targeted federal, state, and municipal officials—intending that their followers would use the information to attack the targeted individuals; and disseminated terrorism instruction manuals and bombmaking guides, intending that followers would use them to commit bias-motivated mass murder and terrorist attacks on critical infrastructure.  The defendants recruited young and impressionable teenagers to do their dirty work, promising them eternal glory—"Sainthood"—in return for committing an act of mass violence.  Inspired and guided by the Terrorgram Collective, several teenagers—described in the Indictment as "Attacker 1", "Attacker 2", and "Attacker 3"—carried out attacks (a bias-motivated mass-shooting in Slovakia, a bias-motivated mass-stabbing in Turkey) or were planning on carrying out an attack (an attack on energy facilities in the United States) when they were arrested by law enforcement. The most

---

[6] Defendants are charged with one crime of violence—transmitting threatening communications, in violation of 18 U.S.C. § 875(c) (Count 12); seven counts of soliciting a crime of violence (Counts 2, 3, 4, 5, 6, 7, 8); three counts of doxing a federal official with the intent to incite the commission of a crime of violence (Counts 9, 10, and 11); and two counts of distributing bombmaking instructions with the intent that they be used for or in furtherance of a crime of violence (Counts 13 and 14).

[7] "Federal crime of terrorism" is defined at 18 U.S.C. § 2332(b)(5)(B) and includes "a violation of … [§] 2339A (relating to providing material support to terrorists)."  § 2332(b)(5)(B); *see also Hir*, 517 F.3d at 1086 n.2 ("Abd Hir is charged with providing material support to a terrorist under 18 U.S.C. § 2339A, an offense identified as a "[f]ederal crime of terrorism" under 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of fifteen years in prison is prescribed.").

recent attack, the mass-stabbing in Turkey, was committed just a few weeks ago. *See* ECF No. 1, General Allegations.

In sum, both the nature and circumstances of the charged crimes weigh in favor of detention. *See Mehanna*, 669 F. Supp. 2d at 165-66 (detaining defendant charged with violating § 2339A, finding that the defendant "promoted terrorist activities, encouraged others to engage in terrorism, recruited others to participate in terrorism, and protected, or attempted to protect, a terrorist from law enforcement scrutiny."); *United States v. Cole*, 465 F. Supp. 3d 1175, 1178 (W.D. Wash. 2020) (detaining defendant who "targeted victims because of their religion and ethnicity" and finding that, even though defendant had no criminal history or history of violent acts, "[t]he defendant is viewed as a risk of danger based on the nature of the instant offense, history of alleged weapon possession, and ties to an extremist organization."); *United States v. Dai*, No. 323CR478BKSTWD, 2023 WL 11016392, at *6 (N.D.N.Y. Dec. 19, 2023), *aff'd*, 99 F.4th 136 (2d Cir. 2024) (finding, in prosecution under § 875(c), that the nature of the offense supported detention when the defendant was alleged to have "posted online multiple threatening messages directed at the Jewish community at Cornell University including violent threats to kill Jewish students, rape Jewish women, and behead Jewish children").

### 2.    *Weight of the Evidence*

"The weight of the evidence has the least force in the court's analysis, in recognition of the presumption of innocence that attaches to [a] defendant at the pretrial stage of a criminal proceeding." *United States v. Keeton*, 457 F. Supp. 3d 855, 859 (E.D. Cal. 2020), *aff'd*, No. 20-10162, 2020 WL 4805479 (9th Cir. June 17, 2020). This consideration factors into a court's analysis most heavily where charges are supported by scant or unreliable evidence, at one end of the spectrum—militating against detention—or by overwhelming and reliable evidence, at the other end—militating in favor of detention.

The weight of the evidence against the Defendants militates in favor of detention.

First, the volume of evidence against the Defendants is staggering. In addition to the thousands of individual posts and messages, several of which are documented in the indictment, the evidence includes, but is not limited to: lengthy, detailed publications created and disseminated by the Defendants containing solicitations to commit murder and other crimes of violence as well as instructions for how to carry out bias-motivated attacks; a hit list of enemies created and disseminated by the Defendants

1  including the identified targets' pictures and home addresses; tactical instruction manuals disseminated

2  by the Defendants regarding how to make explosive devices and other dangerous weapons; and video

3  productions created and disseminated by the defendants celebrating white supremacist mass-casualty

4  attacks and exhorting viewers to commit their own attack.

5        Second, the evidence supporting the charged crimes against the Defendants is reliable because it

6  consists principally of the Defendants' own recorded statements: digitally recorded statements they

7  made online in Terrorgram channels, group chats, publications, documentaries, and direct messages; and

8  audio-recorded statements they made over the phone, and in person, to other individuals and members of

9  the Terrorgram Collective.  Thus, the charges against the Defendants do not depend on a witness with a

10  motive to lie, or forensic evidence capable of being contaminated; the charges are based on the

11  Defendants' own statements, corroborated by devices seized from other members of the Terrorgram

12  Collective, and repeated over the course of several years. *See United States v. Saab*, No. 19-CR-676,

13  2021 WL 5868157 at *19 (S.D.N.Y. Dec. 10, 2021) ("The weight of the evidence against Saab appears

14  to be quite strong, given that it consists primarily of statements he provided to law enforcement officers

15  over the span of several months, in a dozen interviews.").

16        Third, the foregoing evidence is corroborated by Defendant Allison's post-arrest confession, and

17  by the incriminating evidence seized pursuant to search warrants executed after their arrests.  In his post-

18  arrest interview, Defendant Allison admitted to his involvement with the Terrorgram Collective and

19  confirmed the accuracy of the allegations against him.  In the post-arrest searches, federal agents found a

20  wealth of additional corroborating evidence: illegal firearms, Terrorgram publications, an Atomwaffen

21  mask, Nazi paraphernalia, and links to other white supremacist accelerationists, among other evidence.

22        In summary, the weight of the evidence against the defendants is both reliable and strong, and this

23  factor supports the defendants' pre-trial detention. *See United States v. Tortora*, 922 F.2d 880, 886 (1st Cir.

24  1990) (finding that "evidence of [defendant's] guilt is both substantial and credible" because the prosecution

25  "is based in large part on direct evidence, including tape recordings").  But even in cases with weaker

26  supporting evidence, courts have nevertheless found detention warranted where, as here, the defendant is

27  charged with a federal crime of terrorism. *See supra* Footnote 5.

28

### 3. History and Characteristics

In evaluating the defendants' history and characteristics, the BRA instructs the Court to consider "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."  18 U.S.C. § 3142(g)(3)(A).

Several of the above factors weigh neither for nor against detention.  At this juncture, the United States does not have sufficient information upon which to base an informed judgment about the Defendants' physical condition, mental condition, or history of drug or alcohol abuse.  Both Defendants remain in touch with their parents, but have no families of their own.  The Defendants have spent most of their lives in their respective home states, but they have not cultivated strong roots in their communities.

The most pertinent factor, in the government's view, and the one that weighs most heavily in favor of detention, is the Defendants' character.  The Defendants are self-proclaimed and unapologetic white supremacist terrorists who have solicited like-minded extremists to commit bias-motivated mass-murder, political assassinations, and terrorist attacks on critical infrastructure.  The defendants proudly support terrorism and violence, and they have dedicated their lives to inspiring people to commit terrorist acts.  As noted in Footnote 1, both Defendants have pledged to keep doing so until the day that they die.  The Defendants' character weighs heavily in favor of detention.

Ordinarily, the absence of a criminal record weighs against detention, but the fact that the Defendants have recruited and enlisted impressionable teenagers to commit attacks on their behalf, and have thereby avoided prior convictions, weighs in favor of detention, not against it. *See United States v. Patriarca*, 948 F.2d 789, 792 (1st Cir. 1991) (concurring with district court's conclusion "that the absence of a record was at least in part because [defendant's] position as Boss allowed him to rely on others to commit substantive crimes" such that he "did not have a clean slate despite his lack of a criminal record").

Moreover, each Defendant has personally engaged in criminal conduct that is not reflected in their criminal history.  In a Terrorgram group chat, in June 2022, Defendant Humber stated: "My husband and I caught our first case together a few months after we started dating. Got into a high speed

chase, got away, were fugitives for a month." *See* Exhibit Z.  On June 2, 2022, Defendant Allison and a second individual were charged in connection with an incident in which they entered onto the property of a closed business wearing a mask, gloves, and a backpack.  It does not follow, from the fact that those cases did not result in convictions, that the Defendants are harmless, law-abiding citizens.

Furthermore, the evidence seized from the Defendants during and following their arrests indicates that they knew they were engaging in criminal activity and had plans to commit violent crimes. Defendant Humber had more firearms and ammunition than a law-abiding citizen would need for hunting or self-defense, including the following items hidden in her safe: a short-barreled rifle, high-capacity magazines, and unregistered handguns.[8]  When Defendant Allison was arrested, he was wearing a backpack containing zip ties, duct tape, a gun, ammunition, a knife, and lock-picking equipment—items that can be used to break into a house or building, tie up innocent victims, and hurt or kill them.  Back at Defendant Allison's apartment, he had a go-bag containing $1500 cash, a passport, an original birth certificate, clothes, deodorant, baggies of pills, a thumb drive, sim cards, a firearm holster, ammunition, an Atomwaffen mask, and a black balaclava—items needed to flee the country at a moment's notice when facing an imminent arrest.

The Defendants' history and characteristics—and their character in particular—weigh in favor of detention.  Even if this Court were to find the Defendants' criminal history weighed against detention, however; that factor would not be enough to override the countervailing factors supporting detention. *See supra* Footnote 5.

### 4.   *Risk of Flight*

The Defendants pose a serious flight risk based on their sentencing exposure, their minimal ties to their communities, and their extensive ties to a domestic and international network of terrorists.

The Defendants are charged with fifteen felony offenses that carry a cumulative statutory maximum sentence of 220 years in prison, and a Guideline range of life in prison—a sentencing exposure that gives them a powerful incentive to flee and, accordingly, militates strongly in favor of detention. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (noting that defendants who

---

[8] Federal authorities are currently investigating the history and characteristics of those items to determine whether their possession violates state or federal law.

face "graver penalties . . . have an even greater incentive to consider flight"); *Gebro*, 948 F.2d at 1122 (finding that defendant's previous sentence to lengthy incarceration for the same underlying charges "makes it more likely that he will flee" before new trial); *United States v. Figueroa-Alvarez*, 681 F.Supp.3d 1131, 1141 (D. Idaho 2023) (noting that the Ninth Circuit permits the district court to consider possible punishment as an incentive for a defendant to flee) (citing *United States v. Santos-Flores*, 794 F.3d 1088, 1092 (9th Cir. 2015)).

The Defendants' risk of flight is compounded by the minimal connections they have to their communities. Both Defendants are unmarried, have no children, work unsalaried jobs, and do not own homes. Defendant Humber recently expressed her intent to move from California to Idaho. In short: there are no forces tethering them to their communities strong enough to countervail their incentive to flee the jurisdiction to avoid life in prison.

By contrast, the Defendants—leaders of a transnational terrorist group—have strong ties to a domestic and international network of terrorists upon whom they may rely to flee and conceal their whereabouts. If Defendants Humber and Allison were released and chose to flee from authorities, they would not need significant resources to do so. Many members of the Terrorgram Collective have access to guns and live within driving distance of Defendants Humber and Allison. Given the Defendants' strong incentive to flee, and their connection to terrorists around the world, the Defendants could also attempt to flee the country—and they would not be the first racially motivated violent extremists to do so. *See* Adam Goldman and Ali Winston, *F.B.I. Arrests White Nationalist Leader Who Fled the Country for Central America*, New York Times, Oct. 24, 2018, https://www.nytimes.com/2018/10/24/us/fbi-white-nationalist-robert-paul-rundo-rise-above.html; Ali Winston, *White supremacist Robert Rundo extradited from Romania to US to face charges*, The Guardian, Aug. 2, 2023, https://www.theguardian.com/us-news/2023/aug/02/robert-rundo-white-supremacist-extradited-romania-charges-los-angeles; Daniel De Simone, Andrei Soshnikov & Ali Winston, *Neo-Nazi Rinaldo Nazzaro running US militant group The Base from Russia*, BBC, Jan. 24, 2020, https://www.bbc.com/news/world-51236915.

Furthermore, the fact that Defendant Allison kept a go-bag in his apartment—containing $1500 cash, a passport, an original birth certificate, clothes, deodorant, baggies of pills, a thumb drive, sim

14

cards, a firearm holster, ammunition, an Atomwaffen mask, and a black balaclava—indicates that he had a plan to flee the country, but law enforcement officers arrested him before he got the chance to do so. Releasing Defendant Allison would give him a second chance to evade accountability for his crimes.

In summary, if the Defendants are released, they have both the incentive and the means to flee, and they pose an unacceptably high risk of failing to appear in court.

### 5.    Risk of Destruction of Evidence

If the Defendants are released, there is a strong likelihood that they will attempt to destroy evidence or instruct other members of the Terrorgram Collective to do so on their behalf.

The Defendants have the technical ability to destroy digital evidence and they have expressed a willingness to do so in the event of an arrest by federal authorities.  In May 2023, after the FBI interviewed a member of the Terrorgram Collective, Defendant Humber wrote in a group chat: "He said he has a HDD full of stuff that'll send him to jail. I told him to bleach bit everything and destroy the drive." *See* Exhibit C.  That same month, Defendant Humber direct messaged a member of the Terrorgram Collective to "delete" an account because "the feds have [Terrorgram Collective member's] phone and pc . . . ."  *See* Exhibit D.  In November 2023, after the arrest of Brandon Russell, founder of Neo-Nazi group Atomwaffen Division and member of the Terrorgram Collective, Defendants Humber and Allison participated in a group chat where they discussed deleting evidence of their communications with Russell on Terrorgram.  Defendant Humber posted, "nuke the old chat." Defendant Humber asked Defendant Allison: "can you wipe the chat?"  Defendant Allison responded, "u want me to?"  Defendant Humber replied, "Yeah if you can".  Defendant Allison replied, "okay yeah". *See* Exhibit E.

The risk that Defendants Humber and Allison would destroy evidence if released from custody is heightened by the fact that Telegram is a cloud-based application, meaning that Telegram data on devices seized from the Defendants can be digitally wiped remotely by the Defendants by logging into their accounts on other devices and deleting the data.  That heightened risk differentiates this case from cases supported principally by witness testimony or physical evidence seized by law enforcement—cases in which defendants might have the intent to destroy evidence but lack the practical ability to do so.

Because the Defendants have demonstrated both the *intent* and the *ability* to destroy evidence, if released, this consideration weighs in favor of detention. *See United States v. Powell*, No. 21-00290,

2022 WL 769479, at *2-3 (D. Idaho Mar. 14, 2022) (detaining defendant who "has shown a willingness to destroy evidence" and tamper with victims); *United States v. DeGrave*, 539 F.Supp.3d 184, 207 (D.D.C. 2021) (finding serious risk that defendant who previously instructed others to delete texts and destroy evidence would "attempt to obstruct justice if he is released on bond"); *United States v. Rhodes*, 648 F.Supp.3d 801, 811 (E.D. Tex. 2022) (detaining defendant who deleted evidence of planned attack on the Capitol, "exhibit[ing] an extreme defiance to federal authority that raise[s] doubt as to Defendant's ability and willingness to comply with conditions of release").

### 6.   *Danger Posed by Release*

If the Defendants were released, they would pose several distinct and compelling dangers: (A) they would pose a danger to communities all over the world by continuing to provide material support to terrorists and soliciting bias-motivated mass-murder, political assassinations, and terrorist attacks on critical infrastructure; (B) they would pose a danger to people they perceive to be government informants and undercover agents by attempting to retaliate against them; and (C) they would pose a danger to any law enforcement officers called upon to execute arrest warrants against them—officers at risk of being ambushed by committed terrorists who have advised other members of the Terrorgram Collective facing arrest to lie "in wait, mags loaded, ready for a pig hunt" (Defendant Humber) and to "go down fucking shooting" (Defendant Allison).

#### a.   *Danger to Communities all over the World*

The "danger to the community" factor, courts have explained, captures not only the risk that the Defendants will engage in physical violence; it also reflects the danger that they will continue to engage in criminal activities to the detriment of the community. *See Tortora*, 922 F.2d at 884 ("It is important to note that danger to the community was not meant to refer only to the risk of physical violence."); *United States v. Boy*, 322 F. App'x 598, 600 (10th Cir. 2009) (quoting *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989)) ("The concept of safety of the community under § 3142(e) is not limited to the danger of physical violence, but rather 'refers to the danger that the defendant might engage in criminal activity to the detriment of the community.'").

The relevant community, for purposes of the Bail Reform Act, stretches beyond the community where a Defendant resides or engages in criminal activity; it includes any place, domestically or abroad,

that faces a risk of danger posed by the Defendant's release. *See Hir*, 517 F.3d at 1088 ("Where, as here, a defendant is charged with an offense that had a significant adverse effect on a community abroad, we see no justification for preventing a court, for bail purposes, from considering the continuing risk to that community that might be posed by the defendant's pre-trial release."); *United States v. Petersen*, 557 F. Supp. 2d 1124, 1130 (E.D. Cal. 2008), *as amended* (May 23, 2008) (noting that "community" "extends beyond the district in which the crimes have occurred" and that "[t]he district judge may determine the threat a defendant poses to any community, whether in the United States or abroad").

Releasing Defendants Humber and Allison would pose a grave risk to the worldwide community. As stated in Paragraph 2 of the General Allegations in the Indictment, the ultimate goal of the Terrorgram Collective is to "ignite a race war and 'accelerate' the collapse of the government and the rise of a white ethnostate." The Defendants have already successfully induced terrorist attacks in furtherance of that goal. Attacker 1 shot three people outside of an LGBT bar in Bratislava, Slovakia; and just a few weeks ago, Attacker 3 stabbed five people outside of a mosque in Eskisehir, Turkey. As reflected in Footnote 1, the Defendants are committed to that goal and have vowed never to quit. Their use of the internet enables them to recruit and radicalize people all over the world. If they are released, there's no telling which community, in which country, would be victimized next. The danger to the worldwide community posed by the Defendants' release is grave, and weighs strongly in favor of detention. *See United States v. Musse*, 107 F. Supp. 3d 1012, 1015 (D. Minn. 2015) (detaining defendant in prosecution for terrorism charges, including conspiracy to provide material support to a designated terrorist organization, finding that "the Defendant poses a risk of harm to the community" because he attempted to join a violent terrorist organization and, had he succeeded, he likely would have "reach[ed] back to Minnesota through social media to recruit other young men").

Placing strict restrictions on the Defendants' conditions of release would not mitigate that danger. Unlike traditional criminals, whose danger to the community can be reduced by confining them in their homes or a halfway house, all the Defendants need is an internet connection to continue their criminal activity. *See United States v. Haider*, No. 23-CR-00299, 2023 WL 8544277, at *3 (E.D. Cal. Dec. 11, 2023) ("If released, the Court is concerned about Defendant's ability to access the internet either on one of his family member's devices, or some other device, to . . . cause further harm."); *United States v.*

1   *Baker*, No. 23-CR-00261, 2023 WL 8254717, at *2 (D. Idaho Nov. 29, 2023) (affirming magistrate

2   judge's detention decision that "underscored the instrumentality of the internet to [defendant's] alleged

3   crimes and that there was no practicable method of barring his internet access if he were to be

4   released"); *United States v. Marigny*, No. 20-MJ-70755, 2020 WL 4260622, at *3 (N.D. Cal. July 24,

5   2020) (detaining defendant because "[w]hile phones and computers may be placed out of reach to limit

6   Defendant's Internet access, they are overwhelmingly available in the community such that Defendant

7   could gain access to the internet with virtually no supervision").

8        Ordering the Defendants not to use the internet would not solve the problem either because the

9   Defendants have demonstrated the intent and ability to circumvent rules designed to restrict their

10  wrongdoing.  During their tenure as leaders of the Terrorgram Collective, Telegram frequently banned

11  the Defendants' Telegram accounts, channels, and chats for posting extremist content.   Rather than

12  cease the offending conduct, the Defendants responded by creating new Telegram accounts, channels,

13  and chats; by re-uploading their banned content; and by devising schemes designed to circumvent future

14  Telegram bans. *See, e.g.*, Exhibits F-J.  Defendant Allison even taunted Telegram by naming one of his

15  accounts, "BanThisChannel." *See* Exhibit K.  The Defendants' course of conduct demonstrates their

16  contempt for restrictions on their behavior and their willingness and technical ability to flout them.

17       Given this history, the Court can have no confidence that the Defendants would comply in good

18  faith with a prohibition on internet use.  *Hir*, 517 F.3d at 1092 (rejecting proposed release conditions on

19  the basis that they "contain one critical flaw. In order to be effective, they depend on [the defendant's]

20  good faith compliance"); *Kurashev*, 2023 WL 8358108, at *5 ("[D]efendant's use of private networks

21  and encrypted messaging applications, and his successful deletion of specific communications, are not

22  consistent with someone acting only in good faith.").

23       Furthermore, because the Defendants committed the bulk of their criminal activity over the

24  internet, frequently changing account names and using sophisticated technologies to hide their true

25  location, the Court would have no reasonable means of monitoring the Defendants' compliance with

26  conditions of release.  *See Hir*, 517 F.3d at 1092 (rejecting release conditions in part because the charged

27  crimes "involve communications [over the internet] and that are therefore not readily susceptible to

28  effective monitoring"); *United States v. Eccleston*, 140 F. Supp. 3d 102, 107 (D.D.C. 2015) ("According

to the government, Eccleston committed the charged offenses from the Philippines using a computer and a variety of non-attributable e-mail accounts. … [this] is a case in which supervision can do little to alleviate the risk that the defendant might access a computer or other electronic device and continue to engage in the alleged criminal behavior.").

In short, there are no conditions of release this Court could impose that would substantially mitigate the risk that the Defendants would find untraceable ways to access the internet, continue to solicit attacks, and, as detailed in the next Section, retaliate against people they suspect of being government informants or undercover agents.

> **b.      Danger to Suspected Informants, Witnesses, and Undercover Agents**

If the Defendants are released, they pose a danger to people they suspect of being government informants or undercover agents.

In March 2023, after the arrest of Brandon Russell, founder of Neo-Nazi group Atomwaffen Division and member of the Terrorgram Collective, Defendants Humber and Allison participated in a group chat where they speculated about the identity of the government "snitch" who was "responsible for getting Brandon [Russell] and Sarah [Clendaniel] locked up." *See* Exhibit L.  Defendant Humber posted a link to a lengthy guide on how to deal with "rats" and "snitches." *See* Exhibit M.  Another member of the Terrorgram Collective wrote: "I'ma blow your head off [slur] and torch your field office." *Id.*  Defendant Allison wrote: "Idk [I don't know] how we'd get a full dox on him but damn it would be fuckin great if we could." *See* Exhibit N.  Defendant Allison wrote: "mf [motherfucker] deserves a list[9] post". *See* Exhibit O.

In August 2023, during a recorded jail call between Defendant Humber and Brandon Russell, Defendant Humber told Russell that she had a suspected informant's photograph and was running it through facial recognition software in order to identify him.

Just last week, Defendants Humber and Allison and other members of the Terrorgram Collective discussed in a group chat a recent article, posted by Defendant Allison, reporting that witnesses against Brandon Russell would be permitted to testify in disguise. *See* Exhibit P.  Defendant Humber posted,

---

[9] The List is Terrorgram's hit list of targets for assassination. *See* ECF 1 (Indictment, Paragraphs 9-15 of the General Allegations).

"He'll [Russell] know who they are tho.  Hell, WE already know who 2 of them are lmao." *See* Exhibit Q.  Another member wrote: "Death to Snitches" and Defendant Humber "liked" the post. *See* Exhibit R.  Another member wrote that he had been approached by the FBI and invited to cooperate.  Defendant Humber responded: "I hope every rat who takes them up on that offer dies in a fire." *See* Exhibit S.

Where, as here, the Defendants and their co-conspirators have expressed the intent to root out and retaliate against people they perceive to be government informants or undercover agents, that factor weighs strongly in favor of detention. *See United States v. Langenhorst*, No. 05-50067, 130 Fed. App'x. 892, at *2 (9th Cir. 2005) (defendant detained pending trial based in part "upon the allegations in this case of tampering with and retaliating against witnesses"); *United States v. Heffington*, No. 08-0224, 2009 WL 112375, at *4 (E.D. Cal. Jan. 15, 2009) (detaining defendant where evidence "suggests that co-conspirators" of defendant, including other members of the motorcycle club of which he was a part, have threatened "cooperating witnesses, informants, and/or alleged victims," even though "[n]one of these are specifically referable to the Defendant"); *Tortora*, 922 F.2d at 886 (finding that defendant is dangerous and must be detained in part because he "has sworn an oath to kill informants").

### c. *Danger to Law Enforcement*

If the Defendants are released and fail to appear for trial, and a warrant is issued for their arrest, Defendants pose a grave risk to any law enforcement officers who would be called to arrest them.

Both Defendants have called for and celebrated the murder of law enforcement officers:

- In October 2022, Defendant Allison posted Page 75 of The Hard Reset, titled, "Executing An Agent," which reads: "Why should we worry about a knock on the door from the feds?  They should be the ones worrying about us.  What prevention can there be against a seemingly ordinary person suddenly drawing a gun and executing an agent wherever he may find himself at any given moment?  They wear uniforms a lot, we spend all of our time out and about wearing plain clothes.  Only a few of them have to die for all of us to get some relief." *See* Exhibit T.

- Defendant Allison produced and, in February and May 2021, disseminated on Telegram, videos titled, "Enemy Number One" and "[REDACT][10] The Police"—which depict the murder of law enforcement officers. *See* Exhibit U.

- In January 2023, Defendant Humber posted an image of a group of police officers inside the sight of a firearm—as if taken from the perspective of a person aiming a gun

---

[10] "Redact" is a term used in the Terrorgram and other extremist online communities in place of the word "kill" to avoid algorithms that detect the promotion of violence and extremist content.

at them. Under that image, Defendant Humber posted a message encouraging people to commit ambush attacks against law enforcement officers. *See* Exhibit V.

In addition to calling for and celebrating violence against law enforcement officers generally, the Defendants have specifically instructed members of the Terrorgram Collective to kill law enforcement officers sent to arrest them.   In January 2021, Defendant Allison advised Terrorgram users: "don't let yourself get vanned"—or arrested—"stay armed. stay ready. go down fucking shooting." *See* Exhibit W. In August 2022, Defendant Allison posted Page 20 of The Hard Reset, which discusses collecting loose hardware to use as bomb shrapnel to kill law enforcement officers that attempt to execute a no-knock warrant. *See* Exhibit X.  In August 2023, Defendant Humber advised Terrorgram users that the only time they should threaten violence over the internet, rather than commit the violence in the real world, "is when you are lying in wait, mags loaded, ready for a pig hunt. Expect them to come for you, because they will, and BE READY when they show up.  If an ambush attack against System pigs is your destiny, good luck and godspeed." *See* Exhibit Y.

Collectively, these posts create serious concern that, if released, the Defendants will abscond and attack law enforcement officers sent to arrest them.  This concern is heightened by the Defendants' ability to access firearms and their technical and tactical knowledge regarding creating homemade weapons and explosives. *See Cole*, 465 F. Supp. 3d at 1178 ("The defendant is viewed as a risk of danger based on the nature of the instant offense, history of alleged weapon possession, and ties to an extremist organization.").  The seizure of the Defendants' firearms incident to their arrests and pursuant to court-issued search warrants did not eliminate this danger, as the Defendants have access to firearms[11] and manuals for creating homemade explosives, which the Defendants could assemble with products purchased on the open market. *See* ECF 1 (Indictment, Paragraph 18 of the General Allegations).

In sum, there is an unacceptably high risk that Defendants would follow their own advice to members of the Terrorgram Collective—commit an "ambush attack" against officers [Humber] and "go down fucking shooting" [Allison]—a harrowing outcome made more likely by their access to firearms,

---

[11] Defendant Humber, for example, has created, and has advised other members of the Terrorgram Collective how to create, 3D-printed firearms, and she stores her 3D-printed firearms at the residence of a family member who lawfully owns firearms Defendant Humber could access if released.

1  knowledge how to make improvised explosive devices, and stated willingness to murder others in

2  furtherance of their accelerationist agenda.

3  <center>**V.   <u>CONCLUSION</u>**</center>

4      For the reasons set forth above, and for the additional reasons that may be offered by the United

5  States at a detention hearing in this matter, Defendants Humber and Allison, if released, would pose an

6  unacceptably high risk of flight and a grave danger to law enforcement officers, people they believe to

7  be government informants and undercover agents, and members of the worldwide community—risks

8  that no condition or combination of conditions can reasonably mitigate.  Accordingly, the United States

9  respectfully submits that the Bail Reform Act compels their detention pending trial.

10

11  /s/ Angela L. Scott        /s/ Christopher J. Perras      /s/ Jacob Warren
ANGELA L. SCOTT         CHRISTOPHER J. PERRAS     JACOB WARREN

12  Assistant U.S. Attorney       Special Litigation Counsel      Trial Attorney

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBITS A – Z

FILED UNDER SEAL

PURSUANT TO

LOCAL RULE 141